

Signed/Docketed
July 17, 2012

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 11-37706 MER |
| RANDALL K. WALCK ) | |
| CINDI A. WALCK ) | Chapter 11 |
| ) | |
| Debtors. ) | |

## ORDER

This matter comes before the Court on the *Motion for Relief from Stay* ("Motion") filed by Grand Valley Bank ("GVB"), and the *Debtors' Response to Motion for Relief from Stay Filed by Grand Valley Bank* ("Response") filed by Randall and Cindi Walck (the "Debtors"). The Court has considered the evidence and legal argument presented by the parties, and hereby makes the following findings of fact and conclusions of law.

## JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G), as it involves administration of the bankruptcy estate and a motion to terminate, annul, or modify the automatic stay.

## BACKGROUND FACTS

The Debtors filed their voluntary Chapter 11 petition on November 29, 2011. They are the managers and members of several business entities, including a former debtor in this Court, Plateau Energy Partners, LLC ("Plateau"), Chapter 11 Case No. 11-13182 MER. In that case, GVB obtained relief from stay in connection with 240 acres of real property owned by the Debtors (on which Plateau held an oil and gas lease) on October 28, 2011, approximately one month before the Debtors filed their petition. Plateau's case was dismissed on the motion of the Debtor on November 18, 2011. The Court's order granting relief from stay in that case found, *inter alia*, the case had been filed in bad faith.

On March 23, 2012, the Debtors filed their Plan of Reorganization and Disclosure Statement. At the hearing held regarding the Disclosure Statement on June 20, 2012, the Court indicated further proceedings regarding the Disclosure Statement and Plan of Reorganization would be held in abeyance pending the ruling on this Motion.

The Debtors own three operating ranches in Mesa County, Colorado (the "Ranch Properties"). They also own a residence in Grand Junction, Colorado, and a rental property which is rented to Mrs. Walck's mother. GVB claims a security interest in the three Ranch Properties and the rental property.[1] The parties have disputed the value of the Ranch Properties.

According to GVB's former president, a bulk sale appraisal was required by applicable bank regulations. As a result, GVB's appraiser, Mr. John Nisley, valued the Ranch Properties for purposes of a "bulk sale" in the aggregate amount of $3.9 million. He believes it would take approximately one to two years to complete such a sale. Mr. Nisley's February 29, 2012 opinion of the combined value of the individual parcels was $5.635 million.[2]

The Debtors' appraiser, Mr. Robert Stevens, estimated the bulk sale value of the Ranch Properties at $4.5 million, if completed within six months.[3] Mr. Stevens also testified to an "as is" fair market value of the individual Ranch Properties, representing their aggregate retail value, of $5,292,000. In his opinion, the Ranch Properties would take twelve to eighteen months to sell individually.

Ms. Sharon Vaughn is the current listing agent for the Ranch Properties. She believes the price should be lowered and new advertising pursued. Ms. Vaughn also believes selling the parcels individually would bring more than a bulk sale. She is aiming her marketing at developers, not ranchers.

## DISCUSSION

11 U.S.C. Section 362(d)[4] provides in pertinent part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay -

---

[1] GVB asserts its major interest is relief with respect to the three Ranch Properties; it would pursue Mrs. Walck's mother's residence only as a last resort. The three Ranch Properties actually consist of four parcels, but two of the parcels are contiguous and are listed as one property. Therefore, the valuation evidence presented by the parties pertains only to the three Ranch Properties.

[2] GVB's Exhibit 19. However, Mr. Nisley noted if the properties were all on the market at the same time, it would not be proper simply to add the individual values together because each property would have a different marketing time based upon its unique features. He went on to state individual value estimates for the properties would include adjustments made for marketing time. For example, he opined the most improved of the Debtors' properties, as opposed to the largest, would sell the fastest.

[3] *See* Debtors' Exhibit J. Mr. Stevens indicated his work constituted a so-called "restricted use" appraisal prepared for a potential lender, Streamlined Funding, contacted by Mr. Walck.

[4] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;[5]

GVB is seeking relief from stay under § 362(d)(1) for cause, specifically lack of adequate protection, including lost opportunity cost, and bad faith.

## A. Adequate Protection and Lost Opportunity Cost

The purpose of providing adequate protection is to ensure a creditor receives the value for which it bargained pre-bankruptcy.[6] Adequate protection is assurance for a creditor that its collateral is not depreciating or diminishing in value. The determination of adequate protection is made on a case-by-case basis.[7] The secured creditor "must, therefore, prove this decline in value – or the threat of a decline – in order to establish a *prima facie* case."[8]

### 1. Adequate Protection From the Debtors' Equity

According to GVB, the amount of indebtedness as of the date of the Motion was $3,710,776, with interest accruing at $1,510 per day, or approximately $50,000 per month.[9] As discussed above, GVB's appraiser valued the Ranch Properties at $3.9 million if sold in bulk. Similarly the Debtors' appraiser valued the Ranch Properties in bulk at $4.5 million. The testimony of the appraisers and the listing agent indicate the value of the Ranch Properties would likely be greater if each property was sold individually.

The bulk sale valuations, according to GVB, were necessary due to banking regulations.[10] However, this Court is not bound by such regulations, and must value the

---

[5] Section 362(d)(1). GVB acknowledges it is not pursuing relief from stay under § 362(d)(2), because it could not show both that the Walcks lacked equity in the collateral and that the property is not necessary for an effective reorganization.

[6] *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).

[7] *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370 (1988).

[8] *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

[9] The Court's calculations find $1,510 X 31 to be $46,810 per month. In addition, counsel for GVB stated the per diem interest rate was $1,349.06 per day, which would result in interest accumulation of approximately $41,820.86 per month. However, no witnesses testified to the $1,349.06 figure.

[10] Mr. Nesley explained banks required bulk valuations most often in considering financing for tract developments.

Ranch Properties in accordance with the purpose of the valuation – in this case, to determine whether GVB is adequately protected.[11]

Accordingly, the Court finds the bulk sale valuations are only one expression of the value for adequate protection purposes. Based on the testimony of both appraisers, the likelihood of selling the Ranch Properties as a single parcel to a single purchaser or group of purchasers was less than selling each individually.[12] Therefore, the Court finds the individual parcel, "as is" market valuation provides a closer approximation of value for the purposes of § 362(d)(1).

Consistent with this finding, the United States Supreme Court has stated a foreclosure or distressed-sale standard is inappropriate for purposes of § 506(a), and directs the proper standard is "replacement value."[13] "*Rash* charges bankruptcy courts, 'as triers of fact, [with] identif[ying] the best way of ascertaining replacement value on the basis of the evidence presented,' while admonishing them not to use 'a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases.'"[14] The *Rash* Court defined "replacement value" as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."[15] Indeed, that corresponds to the definition of "as is," or "fair market" value used by the Debtors' appraiser in reaching his $5,292,000 estimate.[16]

---

[11] *See, e.g., In re M.C. Pipe, Inc.*, 2011 WL 5902604, at *2 (Bankr. E.D.N.C. October 7, 2011) (slip copy), in which the Court noted:

> Establishing the value of collateral is essential to a determination of whether a creditor is entitled to relief pursuant to § 362(d)(1) and (2). Specifically, the value of collateral is critical to (a) whether the debtor has equity in the property and (b) whether that equity is sufficient to adequately protect the creditor. 11 U.S.C. § 362(d)(1)-(2). Sections 362(d)(1) and (2) do not establish a specific method of valuation. *Id*. In *In re Deep River*, 2005 WL 1287987, at *7 (Bankr.M.D.N.C. Mar. 14, 2005), the court stated that "[s]ection 506(a) provides some guidance on valuation issues." Pursuant to § 506(a) the value of a secured claim against property of the estate, for purposes of determining the creditor's secured status, "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property[.]" 11 U.S.C. § 506(a).

[12] The parties did not present evidence as to the values of the Ranch Properties if sold with the two contiguous parcels being sold as one sale.

[13] *Assocs. Comm. Corp. v. Rash (In re Rash)*, 520 U.S. 953, 959-960 (1997).

[14] *In re Castleton Plaza, LP*, 2011 WL 4621123, *3 (Bankr. S.D. Ind. September 30, 2011) (Slip copy) (quoting *Rash*, 520 U.S. at 965 fn. 6).

[15] *Id*. at 960.

[16] Mr. Stevens defined "as is market value" as the total value of the individual parcels in their current condition.

GVB asserted it would sell the property occupied by Mrs. Walck's mother only as a last resort, and GVB's expert's valuation appeared to apply only to the Ranch Properties. The appraisers cautioned against simply adding the values of the individual parcels, and testified as to costs associated with operating the properties and accrual of additional GVB debt during marketing. Based on the appraisers' testimony, the Court also finds the actual fair market value of the property would be closer to the approximate $5.3 million aggregate value expressed by the Debtors' appraiser than the approximate $5.6 million aggregate value expressed by GVB's appraiser, and will adopt $5,292,000 as the valuation for purposes of GVB's Motion only.

The proposed Plan provides the Debtors an eighteen-month opportunity to attempt to market and sell the properties, either separately or as a group. Using the Court's valuation for this motion, the equity could conceivably provide adequate protection for GVB until the properties are sold, either by the Debtors or by GVB. Therefore, the Court finds GVB has not shown lack of adequate protection so as to warrant granting relief from the automatic stay. If the proposed Plan is not confirmed, or it is later shown the appraisers' speculation of higher values from sales of individual properties is not valid, this finding could change. At present, however, GVB's motion is premature as to lack of adequate protection.

The Court notes this case has been pending for nearly eight months, and will put the Debtors' Disclosure Statement and Plan on a "fast track" to determination. Following a status conference to be set by a separate order, firm dates will be set for an amended disclosure statement, plan, and associated hearings, in order to move the case to prompt conclusion.

### 2. Lost Opportunity Cost

The concept of "lost opportunity cost" essentially refers to the cost to GVB of the delay in obtaining possession of its collateral, particularly following the Supreme Court's decision in *Timbers* (cited primarily for its discussion of § 362(d)(2), but actually brought before the Court on a petition concerning § 362(d)(1)). The only cases cited by GVB in support of relief based on lost opportunity costs are pre-*Timbers* cases.

Specifically, the *American Mariner* case, cited by GVB, stated:

> The secured creditor's right to take possession of and sell collateral on the debtor's default has substantial, measurable value. The secured creditor bargains for this right when it agrees to extend credit to the debtor and both parties consider the right part of the creditor's bargain. The right constitutes an "interest in property" that is "created and defined by state law," and we are aware of no federal interest that requires this right of the secured creditor to go unprotected "simply because an interested party is involved in a bankruptcy proceeding." *See Butner v. United States*, 440 U.S. 48, 54-55, 99 S.Ct. 914, 917-918, 59 L.Ed.2d 136 (1979). The Court in *Butner* observed that "[u]niform treatment of property interests by both state and federal courts

within a State serves ... to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' " 440 U.S. at 55, 99 S.Ct. at 918 (quoting *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)). To the extent that the debtor in bankruptcy can prevent the secured creditor from enforcing its rights against collateral while the debtor benefits from the creditor's money, the debtor and his unsecured creditors receive a windfall at the expense of the secured creditor.

We conclude that sections 361 and 362(d) were drafted to preclude such a windfall and to insure that the secured creditor receives the benefit of its bargain. We are satisfied that our holding in this case will not inhibit successful reorganization but rather will promote among other things the ready availability of affordable credit.

We hold that [the secured creditor] is entitled to compensation for the delay in enforcing its rights during the interim between the petition and confirmation of the plan.[17]

However, *American Mariner*, like the other cases cited by GVB, involved an undersecured creditor, not an oversecured creditor like GVB. In addition, *American Mariner* was criticized when Congress was amending the Bankruptcy Code to create Chapter 12, and led to § 1205(a) and (b)(3), which provide that § 361's requirements to pay adequate protection payments did not apply to farm bankruptcies. The *Martin* case, also cited by GVB, was in fact a farm case, involving an undersecured creditor. The case is inapposite for arguing in favor of lost opportunity costs for an oil and gas oversecured creditor.[18] Moreover, *Matter of Embrey*, cited by GVB, discussed the *Martin* case and noted:

> The court of appeals' decision in *In re Martin*, *supra*, technically speaking, did not involve pre-confirmation adequate protection, but the variant employment of the concept of adequate protection in terms of a replacement for the use of cash collateral. Accordingly, the court of appeals was not per se concerned with compensation for delay in enforcement of a creditor's rights. If it were, it is difficult to understand how the delay in enforcement of pre-confirmation rights could be held to be adequately protected only by more delay in the form of a promise to pay in the indeterminate future-or even in the determinate future if the delay in payment is to be unreasonably long.
>
> [I]t seems to this court that the appropriate way to avoid the payment of pre-confirmation adequate protection is to offer to show that there is no delay

---

[17] *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir. 1984).

[18] *See In re Martin*, 761 F.2d 472 (8th Cir. 1985).

in the secured creditor's rights being occasioned by the chapter 11 proceedings; that, if the secured creditor obtained physical possession of the property, it could not sell that property, under current market conditions, until the effective date of the plan (or perhaps longer). Cf. *Matter of Alexander*, 48 B.R. 110 (Bkrtcy. W.D. Mo.1985). Under such circumstances, there can be no "lost opportunity," at least for that period of time as to which the evidence shows that the secured creditor would be unable to dispose of the property at its current value or else so as to cover its balance due. "(T)o avoid overcompensating the secured creditor, the timing of adequate protection should take account of the usual time and expense involved in repossession and sale of collateral." *In re American Mariner Industries, Inc.*, *supra*, at 435, n. 12.[19]

The Circuit Court decision in *Timbers* stated, "the fact that Congress chose legislatively to overrule *American Mariner* only with respect to family farmers cannot support a construction of § 1205 as a congressional endorsement of *American Mariner* in other contexts."[20] On appeal, the Supreme Court noted, "[w]e granted certiorari to determine whether undersecured creditors are entitled to compensation under 11 U.S.C. § 362(d)(1) for the delay caused by the automatic stay in foreclosing on their collateral."[21] The Court pointed out the petitioner was an undersecured creditor to which the debtor had agreed to pay postpetition rents from the debtor's apartment project. The creditor, however, asserted it was entitled to additional compensation. The Supreme Court held property interests protected by Bankruptcy Code provisions allowing an undersecured creditor relief from stay on ground of lack of adequate protection do not include creditor's right to immediate foreclosure, and thus a Chapter 11 debtor's undersecured creditor was not entitled to interest on its collateral as compensation for delay caused by automatic stay in foreclosing on collateral.[22] It is also important to note the Supreme Court's discussion involved undersecured creditors, not oversecured creditors. Thus, this Court finds the cases cited by GVB inapposite, and concludes GVB has not shown it is entitled to relief for cause due to lost opportunity cost.

---

[19] *Matter of Embrey*, 56 B.R. 626, 628-629 (Bankr. W.D. Mo. 1986).

[20] *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363 (5th Cir. 1987).

[21] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, *supra*, 484 U.S. at 369.

[22] *Id.* at 369-372.

**B.    Bad Faith**

GVB also argues the Debtors filed this case in bad faith. The Tenth Circuit Court of Appeals has recognized bad faith as an independent "cause" for relief under § 362.[23] Determining whether a debtor filed for bankruptcy protection in good faith requires the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.[24]

Findings of bad faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and are based on multiple factors rather than on any single event. In this Circuit, several factors have been identified which support a finding of a bad faith filing in a Chapter 11 case: 1) the debtor has only one asset; 2) the debtor has only one creditor; 3) the debtor acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; 4) the debtor was revitalized on the eve of foreclosure to acquire the insolvent property; 5) the debtor has no ongoing business or employees; 6) the debtor lacks a reasonable possibility of reorganization; and 7) the Chapter 11 filing stopped the foreclosure.[25] Individual factors, in and of themselves, may not lead to a conclusion that a bankruptcy filing is in bad faith. Bad faith exists when the cumulative effect of these individual factors, viewed in the totality of the circumstances, paints a factual picture leading to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate.[26]

The question raised by this proceeding is whether the Debtors herein, as distinguished from their entity Plateau, are proceeding in bad faith. No doubt prompted at least in part by GVB's early filing of a motion for relief from stay, the Debtors have filed a disclosure statement and plan, which essentially allow the Debtors eighteen months to buy out GVB through sale, refinancing, or investment, failing which GVB will be allowed to foreclose.[27]

As to the prior case of *Plateau Energy Partners*, this Court stated:

The evidence this Court finds significant to its conclusion bad faith exists herein includes:

---

[23] *See In re Nursery Land Development, Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1966); *In re Pacific Rim Investments, LLP*, 243 B.R. 768, 772 (D. Colo. 2000).

[24] *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986).

[25] *See Nursery Land*, *supra*, at 1416.

[26] *In re Gunnison Ctr. Apts.*, 320 B.R. 391, 400 (Bankr. D. Colo. 2005) (citing *In re Kasdorf*, 64 B.R. 294, 295 (Bankr. D. Colo. 1986)); *In re Plumberex Specialty Products Inc.*, 311 B.R. 552, 560 (Bankr. C.D. Cal. 2004).

[27] Disclosure Statement, p. 7, and Plan, p. 8, ¶ 4.1.

- the filing took place on the eve of the foreclosure sale of the Property;

- the Property is fully encumbered by the lien interest of the Bank;

- the bankruptcy filing was to avoid the foreclosure on the Walcks' personal interests in the Property;

- Debtor has little, if any, cash flow, and no available sources of income to sustain a plan of reorganization;

- Debtor has no employees other than the Walcks;

- Debtor has relatively few creditors other than the Bank, some of whom are the Walcks themselves, all of which are small in relation to those of the Bank; and

- the chapter 11 filing stopped the Bank's foreclosure on the Property.

Bad faith is also evident in the Debtor's pre- and post-petition transfer of leases. In November 2010, the Debtor assigned all of its interest in the Debtor's Leases to Plateau Production Company, LLC - a limited liability company owned by Mr. Walck. The Mesa County, Colorado property records contain a post-petition assignment from Plateau Production Company, LLC back to the Debtor, executed and recorded on February 23, 2011, the day following the Petition Date. Neither of these assignments were disclosed by the Debtor on its statements and schedules, nor were they disclosed during the Bank's Rule 2004 examination of Randy Walck.[28]

    In the instant case, GVB states the Debtors are indebted to GVB along with co-obligor Plateau on most, but not all, of the same debt. According to GVB, the last payment from either Plateau or the Debtors was December of 2009, but GVB's foreclosure sale was stayed by filing of the Plateau case. GVB points out after relief from stay was granted in the Plateau case, the foreclosure sale was rescheduled to November 30, 2011, and stayed by the filing of the Debtors' case.

    According to the Debtors, however, some of the factors present in Plateau are not present here. They have more secured and unsecured creditors than Plateau, which was essentially a single asset estate with a single substantial creditor, GVB. In addition, the Debtors state GVB's attempts to link the bad faith findings of this Court in the Plateau case with the current bankruptcy case are factually inappropriate because GVB acknowledges the Debtors have equity in the Ranch Properties, before considering other collateral.

---

[28] Court's Order of October 28, 2011 in Case No. 11-13182 MER, p. 9.

Specifically, the Debtors allege the efforts of Plateau to pursue its Chapter 11 plans were unsuccessful for a number of reasons, including GVB's insistence that the Plateau debt and the Walck debts be tied together and treated as one.  Where Plateau had only one secured creditor and a handful on non-insider unsecured creditors, the Debtors' Chapter 11 schedules show $4,429,851.79 in secured liabilities, and $1,067,107.00 in unsecured liabilities.  Where Plateau had no cash flow, the Debtors show income from all sources in 2011 of approximately $490,000 and expect between $11,500 to $14,500 per month going forward.  Moreover, the Debtors hope to improve cash flow going forward.  Further, unlike Plateau, where GVB argued it controlled the unsecured creditor class and no plan could get confirmed over its negative vote, such is not the case here.

Moreover, the Debtors contend their individual prospects of reorganization are vastly different from those of Plateau.  Most importantly, the aggregate value of the Debtors' assets (not all of which are pledged to the Bank) have significant value (approximately $1.5 to 2.46 million) above and beyond what is owed to GVB.  The Debtors further point out they have a steady stream of income and cash flow, and a significant number of creditors, both secured and unsecured, other than GVB, will not receive anything approaching full payment if GVB is allowed to foreclose upon its collateral.

The Court agrees with the Debtors that the circumstances surrounding their individual bankruptcy differ significantly from those of Plateau.  The Debtors have demonstrated they have not filed this case in bad faith.  They have proposed a plan which simply gives them eighteen months to market the Real Properties and pay their creditors, including GVB, and provides for surrender of the collateral to GVB after the eighteen month period has expired.

For the above reasons, it is

ORDERED the Motion for Relief from Stay is DENIED.

Dated July 17, 2012                                    BY THE COURT:

_____
Michael E. Romero
United States Bankruptcy Judge